Good morning, Your Honors. Vince Chabria, Deputy City Attorney, appearing for the City and County of San Francisco. I'm appearing with Stacey Layton from the Altshuler-Burzon firm, who represents the interveners. Are you planning to divide your time? Yes, Your Honor. We were hoping initially to reserve two minutes for rebuttal. Before you say how much, I think we'll probably give you each 30 minutes to decide. Very good. Then maybe we could reserve five minutes for rebuttal. And Ms. Layton would like to reserve ten minutes of our opening presentation, if that's okay. Okay. Fine. Thank you. I'd like to start, if I may, by addressing the status quo argument raised by GGRA in its opposition brief. GGRA cites a number of preliminary injunction cases for the proposition that this court does not have the authority to grant a stay pending appeal in this case. And I think that the cases that we cited, both in our brief to the Court and in our 28J letter from yesterday, demonstrate that the principles at play in a motion for a stay pending appeal are significantly different. The opinions I'm referring to are Judge Ludig's opinion from the Fourth Circuit, the Sixth Circuit's opinion in the Granholm case, and also Judge Kleinfeld's opinion, a recent opinion, in the NRDC case here in the Ninth Circuit. All three of those cases are examples of courts granting, of appellate courts granting a stay pending appeal to allow a government program to take effect. Let me ask you this. Is there any material difference in the standard between a stay case, as this is, at least ostensibly, and a preliminary injunction case? I think that with respect to this issue of the status, preserving the status quo, the answer is yes. No, I'm after a different question. It appears to me that with our standard for stay pending appeal and our standard for a preliminary injunction, it looks to me as though it's pretty much the same sliding scale. We agree. That is to say, if you can show a strong likelihood of prevailing, you don't need to show very much hardship. On the other hand, if you can't show a strong likelihood, you've got to show increasing hardship. It seems to me that it doesn't. The standards are not materially different, stay compared to preliminary injunction. And if I'm talking preliminary injunction, I'm not sure I'm so concerned about whether it's status quo or not status quo. I would agree with that, Your Honor. Although I would say that the status quo issue is even less relevant on a stay pending appeal because the purpose of a stay pending appeal is to protect the litigants and the public from the harm that would be caused by an erroneous district court ruling if the erroneous district court ruling were allowed to remain in effect during the pendency of the appeal. And so, Judge Fletcher, that's absolutely right. The standard is the same and the issue of whether the status quo is being preserved or not is question begging. Because in this case, we believe that we have precisely that situation here. Namely, this court needs to protect the litigants and, more importantly, the public from the harm that would result from allowing this erroneous district court ruling to remain in effect during the pendency of the appeal. And without diving too deeply into our brief and into the merits, it's important, I think, to highlight, as Judge Fletcher noted, the stronger the likelihood of success on appeal, the less hardship we have to show. We do believe there's tremendous hardship here, of course. But on the merits, although the risk of preemption case law is, of course, quite complicated, we believe the judge's errors in this case are actually fairly simple ones and fairly fundamental ones. Let me ask you this. I think I'm getting the drift here, but I want to make sure I'm addressing my questions to the right person. Are you going to address the preemption question? Are you going to address the hardship questions, the safe questions, my questions for one or the other for Ms. Layton? I'm prepared to address any question that the court has. She's prepared equally to do the same? Absolutely. So you're just going to walk over the same ground again and correct all his mistakes? That's the strategy, actually, Your Honor. Okay. Let me ask you this, then. Just with respect to the operation of the statute or the ordinance, I understand that an employer can satisfy its obligation under the ordinance by any number of ways. One of them is by having an arrest plan that meets certain standards, and the other one is by making these additional payments per hour to employees, depending on the number of employees and the employee of the particular employer. I got that. How does the ordinance calculate whether or not the payments to an ERISA plan satisfy the obligation under the ordinance, such that there's no obligation to pay the additional hourly fee? As a practical matter. Well, I'm interested not merely as a practical matter, as a matter of law. I mean, how does this operate? If an employer, so to use a practical example, let's say we have a part-time employee who works 20 hours a week. Under the ordinance, and it's a medium-sized employer, under the ordinance the employer is required to spend roughly $93 per month on health care for that employee. If the employer spends $93 or more per month on that employee through an ERISA plan, be it payments to Kaiser or Blue Shield or some other form of ERISA plan, that establishes compliance with the ordinance. Does that mean that Judge White misunderstood the operation of the ordinance? Because my understanding from Judge White's order is that he looked at this as that in order to qualify under the ERISA leg of the ordinance and, therefore, to exempt from the obligation of paying additional money per hour, a certain level of benefits had to be provided, not that a certain amount of money had to be paid by the employer. Am I wrong? I think the problem is that he conflated the provision of benefits provided under ERISA plans and money paid. So I think the answer to Your Honor's question is yes. Judge White explicitly recognized on page 10 of his order that the ordinance does not require the employer to adopt an ERISA plan. I understand that. We may still be at cross-purposes. My understanding of Judge White's order and my understanding of the argument from the Restaurant Association is that in order to exempt oneself from having to pay the additional hourly rate that is the money to the city, the employer could pay a certain amount into ERISA, such that a certain level of benefits was accorded under the ERISA plan to the employee, and that the exemption was not triggered by how much money the employer paid into the ERISA plan, but rather triggered by how many benefits were available under the ERISA plan to the employee. I'm not sure that that's what GGRA is arguing. What's the statute say? The statute is very clear that it simply is the amount of money that the employer is spending on health. Can you point me to the language in the ordinance that says that? Looking at Exhibit B of our motion. Okay. Section 14.3, required health care expenditures. Okay. Required expenditures. Covered employers shall make required health care expenditures to or on behalf of their covered employees each quarter. And then the statute goes on, the ordinance goes on to elsewhere describe how much money per hour the employer must expend per employee. So compliant. Give me the elsewhere there. I believe, Your Honor, it's in the definition section. Let me. Section 14.1B, 7 and 8. Okay. Now, in Section 8, it specifically refers to the expenditure rate. And you'll note in Subsection A, it says that for a large employer, the expenditure is $1.60 per hour, and for a medium-sized business, the expenditure is $1.06 per hour. That is indexed for inflation, so it's gone up a little bit. And so your argument is that the health care expenditures under 7 and the rate under 8, it's all triggered to how much money the employer pays out and is not calculated at all based upon how many benefits come back, for example, under an ERISA plan. That's absolutely correct. Okay. I guess I'll hear from the Golden Gate Restaurant Association on the other side on that question. But a fair amount of their argument seems to me based upon greater Washington, which, and if what you say is right, that argument under greater Washington disappears. Okay. But they can answer that when it's their turn. Okay. That's right. And just to emphasize, I do think that that was the error of the district court, that the court conflated the notion of paying money with the notion of providing benefits. And that really is why we believe that we have a strong likelihood of success on the merits in this case. Turning for the moment to the hardships, there are two significant groups of people who will be harmed during the pendency of the appeal if the court doesn't grant a stay. The first is workers who would benefit from the employer's expenditures. And the city has estimated that roughly 20,000 San Francisco workers would be covered under this ordinance. That is to say, would have the benefit of their employers making expenditures on their behalf under the ordinance. Do they comply only to employees or their families also? An employer can comply with the mandate by providing coverage to employees and to the employees' families. Now, I mean, what does the San Francisco ordinance do? Assuming an employer says, here's your $1.70, do the families get benefits or only employees? Assuming the employer does not choose to comply by purchasing private insurance for his employees. No. Assuming you get the money from the employer. Pay the city. Then that money entitles the individual employee only to enroll in. And there's no coverage for the family. That's correct. Of course, under the program, the employee may pay the city to provide coverage to his family members, but there's no direct linkage between the employer mandate and the family members. So aside from the fact that 20,000 workers would be denied the right to benefit from the employer mandate, it's also important to remember that this Healthy San Francisco program, or the HAP as we refer to it, the health access program as we refer to it in our briefs, is not just for people who work and who are covered by the employer mandate. It's for all uninsured San Franciscans. And if the employer mandate is not allowed to take effect, the city would be unable to expand the HAP program to people who make more than 300 percent, who have an income level of higher than 300 percent of the federal poverty level, which, of course, is a relatively meager $32,000 per year. And the reason the city would be unable to do that is, first of all, it would not have the money from the employer mandate. But secondly, and perhaps more importantly, of course, absent an employer mandate, absent an employer mandate, if the city offers comprehensive health coverage to all workers, there's a tremendous incentive for companies to drop their existing health care coverage that they provide to their workers and foist those workers and their health care needs on the city's taxpayers. I don't understand. Why isn't there an incentive to employers to do that in any event? Well, under the ordinance as it's designed, the employer, it's entirely up to the employer how to make health care payments. So it's not necessarily, it's certainly an attractive option to pay the city in order to avoid having to set up an ERISA plan and all that that entails. But it's the employer's choice. Let me give Your Honor an example. If, for example, this ordinance takes effect and an employer has a number of full-time employees and a number of part-time employees, and the employer already covers, already provides, let's say, Kaiser to its full-time employees and provides no benefits to its part-time employees, rather than making payments to the city, the employer may choose to fold those employees into its Kaiser program. So we don't believe that this ordinance, in fact, this ordinance was carefully designed to avoid creating an undue incentive for employers to drop their coverage and foist their employees onto the city and the city's system and the city's taxpayers. Do you think it's relevant to our decision at this point what the practical consequences of the ordinance would be, how it will affect employees, employers, what they're likely to do or not? Yes. Do you think we can determine that? Yes. We think that, of course, the court must balance the hardship that would be imposed on the city and its public  And certainly there are some employers, as evidenced by this lawsuit, who would prefer not to make payments on behalf of their employees for health care. But we believe that the law is fairly well established in the Ninth Circuit, that that balance tips in our favor. You've used your time. If you want to give Ms. Leighton her time and then have five minutes for rebuttal. Very good. Thank you, Your Honor. Thank you, Your Honors. I would just like to start off by addressing the last question that was posed about whether it matters what employers are likely to do in order to comply with the ordinance. And while that may be relevant to the balancing of the hardships, we don't believe that that's relevant to the merits questions in this case, because this Court and the Supreme Court has made it very clear that a law that establishes incentives to modify ERISA plans or to increase or decrease spending is not preempted so longer, so long as an employer does have a way to comply with the law that does not involve creation or modification of an ERISA plan. And in this case, even the district court judge that struck down the ordinance has acknowledged that that is true. This law was carefully drafted to fall within this court's precedence under WSB Electric, under Associated Builders and Contractors v. Nunn, and under the Supreme Court Dillingham and Travelers precedence. Despite that, the district court disregarded that precedent in striking down the ordinance in a number of different ways. This court has made clear in the WSB case and the Supreme Court in Dillingham that simply mentioning ERISA plans does not render a law preempted. This court has made it clear that measuring an employer's obligations by reference to spending on ERISA plans does not render a law preempted, and that's in the WSB case again and in Funkhauser. This court has made clear that imposing record-keeping obligations upon employers, even if those record-keeping obligations relate to spending that may be on ERISA plans, does not render a law preempted under WSB. This court and the Supreme Court, in multiple cases, have made clear that providing an incentive, even a strong incentive, to an employer to increase or decrease spending on ERISA plans does not render a law preempted. And this court and the Supreme Court have made clear that even if a law addresses benefits and benefits that are typically or usually provided through ERISA plans, that does not render a law preempted so long as it does not force the employer to modify an ERISA plan. Let me ask you this. Do you agree with Mr. Chabia's description of the ordinance in the sense that it requires for the triggering or the triggering of the exemption so you don't have to pay money to the city a certain level of expenditure by the employer rather than a certain level of benefits provided to the employee through the ERISA plan? Yes, that is correct. The law says nothing about the content of the benefits that need to be in the ERISA plan. It seems to me if that's accurate, that takes away virtually all of Judge White's reasoning because his reasoning is based on Greater Washington. I believe that that's right. Greater Washington was about requiring an ERISA plan to modify the level of benefits that it was offering. Because the triggering in Greater Washington was triggered by the level of benefits provided rather than by the amount contributed by the employer. That's correct. That's correct, Your Honor. I also would like to add in terms of the standard for this Court to apply, I would agree with my colleague that the standard for a preliminary injunction and for a state pending appeal is the same. But there is an important difference in this case in that we do have a final judgment in the district court and a final determination on the merits. And so unlike a preliminary injunction case in which there is an incomplete record and the court is deciding who is likely to succeed, the full merits are really before this Court. They are not factual disputes that have yet to be resolved in a trial. Additionally, there has been no balancing of the hardships by the district court. And so unlike a situation in which this Court is reviewing a preliminary injunction and a determination by the district court as to where the balance of hardships lie, this Court's review of those issues is really de novo. What happens as a practical matter if, and this is an if rather than a is going to either deny the request for a stay or to say only, listen, you, the employers, you have to keep your records, but you don't have to pay any money to the city until you've got a final adjudication. What would happen to the rate at which this program would be implemented and insurance provided to the employees potentially covered under this ordinance? Well, there are two parts to the program. There's the health access program that will provide health care to all city residents, not just to people who are employed in San Francisco. And then there's the employer spending mandate. As far as the health access program, the declaration of Mitch Katz, who was in charge of implementing this program in San Francisco, sets forth that the city will be able to expand, to offer the health access program to people who are up to 300 percent of the poverty level, but that that means that 39 percent of the people who would be eligible to participate in the city's public health program will not be able to enroll because they earn an income of over 300 percent of the poverty level, but still do not have health insurance. So it means that those people will be deprived of health care. It also means that... Are you telling me that the city is simply unwilling to implement the program, absent a final judgment that says that the ordinance is constitutional? The city is not able to implement the part of the health access program that would expand health care access to those earning above 300 percent of the poverty level, and that's for two reasons. One is discussed in the Katz declaration, and that's just the level of funding that the city would be receiving from employers who choose to enroll their employees in the health access programs will not be available. And this ordinance was a carefully constructed balance of requiring employer spending, and that was a careful part of the actuarial determinations and of the funding for the program. The other problem is if the city were to open the health access program to all San Francisco residents without requiring employers to maintain a certain level of health care spending, that would provide a very strong incentive for employers to drop existing private health insurance and other forms of health coverage. I'm representing the interveners, and we have the unions that I represent have many members who already have private health insurance, and if their employers knew that they could obtain it. I think I got the drift. That is to say the city is simply unwilling to implement the program absent the final judgment reversing the district court. Are you saying the city would be unwilling to implement it even if we got to stay? No. Oh, okay. I'm sorry. I must have misunderstood the question. I mean, that may be more appropriately addressed to Mr. Chabria, but my understanding is that the city will implement the program fully to include all San Francisco residents who lack insurance if this court issues a stay. If you get to stay. If you get to stay. Yes. Yes. That is correct. I misspoke. I still don't understand. I keep missing the second part of your two points you just made. Could you run over the second one again? Yes. The second point is that currently there are a number of employers that are paying for health care coverage for their workers. If they knew that their workers could obtain a very similar health care access without spending anything, that would provide an incentive for employers to decide to drop health insurance coverage, and that was very much a concern that was reflected. But why isn't that true once your program goes into effect? Once the program goes into effect, employers will be required to maintain a certain level of health care spending, and they then have to decide whether the best use of their dollars is by purchasing private insurance or is by paying the city and permitting their employees to enroll in the city's program. Since they will be required to spend a minimum amount per employee, they may decide that they want to continue their private health insurance coverage for various reasons, because it offers better benefits for families, because there may be emergency care. An employer who now has a better plan than the comparatively minimal city plan, I assume it's a comparatively minimal city plan, why wouldn't an employer who's now providing greater benefits be encouraged? Maybe it doesn't make any difference, but you talk about how employers would be encouraged to drop their plans if it went into effect without requiring their payments. Why wouldn't employers who now give better benefits be encouraged to drop those plans, other than the effectiveness of unions in San Francisco? Why wouldn't they be encouraged to drop those plans and participate in the city's program? Well, right now employers are under no obligation, and some employers have elected because of collective bargaining agreements or because they want their workers to be satisfied, to offer generous or less generous health care coverage. The city didn't want to offer something that was so attractive to employers that it gave an incentive for more employers to decide, well, what the city offers is not really that much worse. We can get it for free. We're going to drop coverage and then our employees will be enrolled. But I think Your Honor is right that it doesn't, that this Court's decision in WSB and the Supreme Court's ERISA precedent makes it clear that it doesn't matter whether a law encourages or discourages employers to increase or decrease their spending on ERISA benefits or ERISA plans, so long as there is a ---- Well, I think you're very lucky you have WSB. Well, and the law was drafted with WSB in mind. WSB sets up a very similar system to this law. It imposes a mandate that employers can satisfy in part if they elect by, or in whole, by spending on ERISA plans. And the basis for the district court's decision is just wholly inconsistent. I have one question that won't take your time because we'll leave close to five minutes for your rebuttal. And it's just out of personal curiosity, because I noticed the plaintiff here is a restaurant association. Is there no collective bargaining agreement providing for health and welfare benefits with the restaurant association? My understanding is that some of the restaurant industry is unionized and has collective bargaining agreements, but that it's a small percentage of the restaurant industry. I mean, those who do have collective bargaining agreements, do they have health and welfare benefits? I believe that there are some restaurants that do, but it's not a substantial percentage of the restaurants that make up these. All right. Thank you. Counsel. Good morning, Your Honors. May it please the Court. I'm Richard Rybicki. I represent the Golden Gate Restaurant Association. And I'd like to start by first addressing the first question that was posed by the Court, which related to the power of the Court to impose today's pending appeal and how close the analogous that was to the question that was posed by the plaintiff. And what I wanted to clarify was the point that we were trying to make in our briefs. My point was not that the Court does not have the power to enter any injunctive relief that changes the status quo. My point was that the cases in the circuit that discuss granting a preliminary injunction and that discuss similar equitable relief, such as state's pending appeal, have a traditional construct of guidelines wherein it's not to be used to disturb the status quo. But Rule 8 doesn't otherwise restrict the Court's equitable power, and the Court does have power to exceed or change the status quo if absolutely necessary. And that dynamic is discussed in the Tanner-Motor Livery case that we discussed in our briefs. The Tanner-Motor Livery case, as you may recall, involved a franchisor and a franchisee of an Avis franchise. And Avis argued that the franchise agreement was terminated with the franchisee, and the franchisee argued that it still held the rights to hold that franchise. And for odd reasons, two competing judges entered two competing preliminary injunctions against one another, one saying that the franchisee could continue to operate and one holding that the franchisee could not continue to operate. The circuit overruled the judge who changed the status quo, noting that that judge hadn't considered the status quo when entering the injunction, but did note that it's not a hard and fast rule, but that when a court did exceed the traditional norms or the traditional guidelines that surrounded a grant of preliminary equitable relief, that it should be especially careful to make sure that it needed to exceed those to address the infinite variety of situations that a court could address, and that the parties seeking to depart from those guidelines should show a heavier burden of showing that that type of extraordinary or unusually extraordinary relief was appropriate. And that is that I wanted to clarify that that was the position that we were taking in the brief, not that the court was utterly constrained from fashioning an equitable remedy. Do you agree with counsel that the cases demonstrate that one of the primary purposes of the status quo is to prevent particular hardship or irreparable injury? No, Your Honor. I believe those are from separate parts of the test. I believe that the inquiry into the balance of harms and the likelihood of success and such is one part of the court's analysis. So not likelihood of success. I'm talking about irreparable injury, that if preserving the status quo causes irreparable injury, you still preserve the status quo? Well, there are cases where both parties could suffer irreparable injury as a result of the entry of an injunction. And the question in that case might be which is the status quo. Well, if one side suffers serious irreparable injury, the other side suffers minor irreparable injury, and you balance the hardships and they tip sharply for the other side, but if you preserve the status quo, that's the result, serious irreparable injury to one of the parties. Is that really consistent with the purpose of preserving the status quo? Well, Your Honor, I can't think of any cases that say that the purpose of the status quo is to subvert the standard test that you would apply in that context. Well, I'm not talking about a test. I'm talking about what the purpose of preserving the status quo is. And it seemed to me from the cases that counsel was right that it's sort of inextricably linked with the idea of avoiding injury. Well, I think rather than inextricably linked, it would be part of the court's equitable power. I think the question would be the court, it's the court's own inherent power to fashion appropriate equitable relief, classic power of the courts. And if the court determines that it needs to disturb that rule, typically preserving the status quo, because the equities of the situation demand it, then it does clearly have that power. But as the Court discussed in Tanner, that power should be exercised sparingly. And when it is exercised, it should be based on specific evidence or a heavy burden of showing the actual harm that would be done. And our arguments in this case are that the city hasn't advanced the type of specific evidence that you would expect to see from a party that was trying to disturb the traditional context in which preliminary relief is given. Rather, it has submitted a couple of declarations that have fairly conclusive statements in them that don't have any factual bases or demographic information, and that that type of evidence isn't sufficient to support it. Well, I thought basically you had two arguments. And one was that it would be a three-month delay in any event because the benefits wouldn't start. It would take three months to actually get the program running so that by that time you could have an argument. That was one argument, as I understood it. And the other argument was, well, it took the city this long to get it into effect, so another few months isn't going to do any particular harm. Are those the two primary arguments? Those are two of the arguments, Your Honor. But the other argument is the city hasn't submitted any evidence that truly shows the court what the effect will be of a delay in the implementation date. For example, for example, the declaration of Dr. Mitch Katz discusses says, for example, we can get back to one of the points that were raised earlier in the argument, that if the employer mandate is prevented from taking effect, the city will be required to limit the people that it can extend the program to. That's in paragraph 12 of Dr. Katz's declaration. There's no foundation or any substantive information, no studies, no economic models, nothing given to the court but a bare statement that the city will be unable to provide. Well, isn't that fairly evident? I mean, your argument is that if you never make contributions, the city should put the same program into effect and cover the same people without employer contributions. No, Your Honor. My point is that there's no evidence that the city's unable to do that, that can carry its burden of showing. But what I'm saying is your argument applies not just to the stay period but to the plan in general for the future. There's nothing particular about this three-month period or four-month or I think probably eight months that would result from going without a stay. There's nothing peculiar about that period. Your argument would apply to the plan permanently, that the city could just as well survive and give the same benefits without an employer contribution if it just chose to raise taxes, for example. Well, my argument isn't that it could do that, Your Honor. My argument is that the city hasn't shown that it can't do that. So it fits into two camps. The first camp are the things that you can fairly discern just by looking at the language of the statute or the ordinance. For example, that employees will not continue or will not begin receiving benefits immediately under the program. They won't be eligible to receive or to participate in the program until at least three months after the program begins. So there's not an immediate pressing need at this moment. Well, won't that be true if the program, instead of going into effect in January, goes into effect in August? Won't it be three months from then? Yes, Your Honor, it would be. And the difference between those two points would be that on the one hand, we're looking at the very limited stay period where virtually nothing can be done for anyone, because even if the program is fully in effect, there will be no benefits flowing immediately or automatically to anybody. And then the question of the program. after which you add the three months. So there's a six-month difference depending on whether we give the stay or not. Yes, Your Honor, if that's the timing that we'll impose, it will be. But in that case, there still has been no evidence that the specific things that the city has argued will actually come to fruition. Well, one thing that will obviously come to fruition is that we will have people who, if the judgment goes against you on appeal, who are in fact entitled to be enrolled in the program will have for that period, whether it's six months or eight months or I don't know how long it's been, will not be covered when otherwise they would have been. But that hasn't been shown, Your Honor. What do you mean that hasn't been shown? In order to participate in the program, you have to enroll in the program. There are two types of possibilities for enrolling in the program. One is if you're a worker, and part of the city's evidence is discussing 20,000 workers who won't receive coverage if the ordinance doesn't go into effect. The other are people who would be entitled to participate in the program because of pure financial levels, whether or not there are employer contributions being made. With respect to the 20,000 workers the city's identified, they will not be automatically enrolled in the program. I understand that. But whatever ambiguities there are, whatever cuts there are in terms of where the lines cut in terms of whether somebody's going to participate or not, those are going to exist whether the program goes into effect now or whether it goes into effect in August, assuming it eventually does go into effect. And the only consequence then is that the same ambiguities show up eight months later. And the people who, in the end, qualify and enroll in the program will qualify and enroll in the program, but they'll do it eight months later than they otherwise would have done. Isn't that right? Yes, Your Honor. So, okay. Got it. Can I ask the question that I addressed to the other side, actually to both Mr. Chabry and to Ms. Layton, and that is how does this ordinance operate? I noticed in your papers to us, on pages 14 to 15, you quote the district court. The district court seems to have thought that this ordinance required not a specific payment from the employer into the ERISA plan as a ground for exempting from the obligation to pay to the city, but rather a specific benefit coming out of the ERISA plan. Now, I'm told by both of those that's not the way the ordinance operates. What's your view as to how the ordinance operates? My view is that that's not how the ordinance operates. And what language in the ordinance or in the regulations supports your view? It would be the same language that was identified in Ms. Chabry. No, no, I'm sorry. You said that's not the way it – are you agreeing with your opponents, that it only requires expenditures, not a level of benefit? That's right, Your Honor. Oh, I see. You are agreeing with that. Oh, I'm sorry. Then you're disagreeing with Judge White. Well, Your Honor, I don't see in the order that that was what Judge White believed. It appeared Judge White didn't believe. Well, wait a minute. I'm quoting from your brief, and your brief is quoting from Judge White. I'm at the bottom of page 14. Under the ordinance, private employers must quote, and I'm now quoting you quoting Judge White, calculate not wages, but benefits available to any covered employee. Then this is now you talking, because the ordinance measures an employer's obligation by reference to the level of benefits already provided by a plan, rather than simply permitting use of a plan, benefit expenditures, blah, blah, blah. And then you go into Greater Washington. It seems to me your argument has just disappeared on you if you agree with them as to how the ordinance operates. Your Honor, this part of the order discusses only Judge White's consideration of the reference two prong of the ERISA argument.  That was the latter part of Judge White's analysis. And Judge White doesn't necessarily need to believe that the plan necessarily looks to the plan language or, excuse me, to benefits in every instance, because the test for reference two includes not only a statute that refers directly to ERISA plans, but also a law that cannot operate irrespective of ERISA plans. Okay. But I now understand your position, then, because I had understood you to be agreeing with what seems to me Judge White's understanding of the ordinance. And I think at that point, on this point, I think Judge White is wrong. I think he simply misunderstands the ordinance. I think what Judge White was talking about that time, Your Honor, was that employers who have ERISA plans, and most employers, in Judge White's opinion, who provide employee benefits are going to be providing them through ERISA plans because there are very few ways that they can. In calculating how much they owe to the city, they will necessarily have to go into their plans almost always, because they will almost always be ERISA plans, and they will then calculate how much they need to pay to the city and what their obligations are. When you say they have to go into their plans, what do you mean, go into their plans? They must actually go into their plan documentation or work with their plan administrator to determine what outlays they have actually made during the relevant period. But they don't have to go into their plan. All they've got to do is look at the check they wrote. They don't have to understand what's in the plan at all, except all they have to do is look at how much money did they spend. They have to look at how much they spent for each particular employee. That's exactly right. And the notion, I believe, that Judge White was following was that this will necessarily impact plan administration. I mean, this will necessarily... Now, how does that impact plan administration if all I'm trying to do as an employer is figure out how much money did I spend per employee into the plan? I believe I misspoke there, Your Honor. What I mean is that his conclusion was that the law hadn't been designed so that it could effectively be implemented without resulting in people regularly, necessarily referring to the amounts that they were outlaying in their plans. And that that necessarily... I'm sorry. Say that again. The amounts what? That they could not, the ordinance could not operate without employers consistently and necessarily referring to outlays in ERISA plans. Outlays by whom? Outlays? By employers. The expenditure the employer makes in writing the check to the ERISA plan. Is that what you mean? In reviewing the plan documents and reporting them. No, no, no, no. What does it have to do with reporting, reviewing the documents of the plan? The employer writes a check every month for each of them. I mean, he gives his accountant or whoever determines this. Here is how many hours this employee worked. Here's the amount we owe for this one. And then he adds them all up and sends one check. Okay, so when he counts, when the employer computes the amount he owes to Joe Smith, who's his dishwasher, he sees that it's less than $1.70 for that hourly rate for that employee. So he sends two checks. One to his plan and one to the city. The plan's not involved at all. It's only the employer who makes his calculation and sends two checks instead of one. Isn't that right? Well, Judge White's theory was that that will always be accomplished by looking at employee benefit. Well, that may be his theory, but I'm asking you. I understand. And the way that that is, the distinguishability of that from, say, WSB, is opposed to, say, a prevailing wage law that allows you to look at any number of things when you're deciding how much you need to pay to satisfy your liability under a particular requirement. But here you don't have to look at anything. When the employer has to look at each employee's record at the end of the month, when he worked, how much he worked, and the employer then calculates, okay, I owe the plan $2 an hour for that employee. And he says, okay, I don't have to send a check to the city. He looks at the next employee and he says, I've only paid $1 an hour for this employee. So he sends $1 an hour to his plan and $1 to the city. How does that require any examination of the plan or any interference with the plan's administration? Well, for looking at the plan, Your Honor, it would be looking plainly at the amount that was paid under the plan. Of the amount? No, no, of course. He writes his check to the plan. He does that anyway. He does it every month. But he doesn't have to look at anything else when he decides what he owes the city. He says, here's what I'm sending the plan. He doesn't have to look at the plan. That he's got to do for his ERISA purposes. And he's, you know, bless him, he's going to do that anyway. Now, the only other thing he's got to do is say, well, this is less than $1.70, so I'll send a second check to the city. I understand, Your Honor. That's correct. It does appear to be what the employer would be doing, yes. And then that would appear that he doesn't interfere with the ERISA plan in any way. Now, Judge White's opinion did rely heavily on. Judge White may have said something, but. And Judge White's opinion is loaded with references to Greater Washington. But given this description of the plan, on which you now all agree, and it seems to, I confess that's how I read the plan too, or the ordinance. I think Greater Washington is entirely off to one side. I think it's just irrelevant here, because Greater Washington was premised upon a comparison of the benefits provided by the plan to the employee. Now, Your Honor, the judge did spend quite a bit of time discussing application of the modern Egelhoff standard with respect to connection. The connection went wrong. Right. And concluded that it would. It concluded a number of things. Not the least of which being that it was, that the law would require employers across the country to monitor, who had employees in San Francisco, to monitor local benefit amounts in San Francisco. Just they might have to, across the country, you know, there's a different minimum wage law in San Francisco. Okay, they've got to pay that too. Tough luck. Well, but the distinction. But see here, I don't see why you say they have to monitor benefit amounts. They don't have to monitor the benefits at all. I think you agreed with what I said the employer has to do. It doesn't matter what benefits they're getting under the plan. All he has to do is see how much he's writing each month for employee X, Y, Z, and write two checks instead of one. Without regard to what kind of benefits are being paid. But Judge White did look at cases like Fielder and the effect that that would have on employers. And remember the congressional. You know, I wouldn't place it all on Judge White because he's not here. You tell us what you think, what the answer is to the fact that the employer has nothing to do except write a second check. I think there's. When the check to the plan doesn't meet the amount that the city has set. I think there are two important points, Your Honor, both of which were hit by Judge White, but I can discuss. First, Judge White discussed, first was the discussion of the interference with traditional ERISA relationships. A wage statute doesn't speak to an area that ERISA is concerned with. A statute that mandates a certain amount of benefit expenditures speaks directly to an area that ERISA is concerned with. But this doesn't mandate any particular level of benefits. But it does mandate that employers pay a certain level or pay a certain amount of benefits each month. No, it doesn't. They can pay, you know, as long as the employer is spending over $1.70. If he buys the most expensive benefits and only gets, you know, care when you have a toothache for that $1.70, that's okay. They don't require any level of benefits. They require an expenditure of a certain amount of money. But consider what that would do for employers nationwide, Your Honor. One of the fundamental reasons ERISA was passed and one of the reasons that it left, that it did not have minimum requirements for welfare benefit plans, was to encourage employers to offer benefits consistently and to offer them throughout the country. If employers know that they're going to be hit with one level of total overall health costs in one jurisdiction and total overall health costs in another jurisdiction, it would create precisely the incentive for employers to offer fewer benefits to people throughout the country. They might have to offer more to people in San Francisco, and they might have to offer more to people in New York. But someone who's in another town that doesn't have a mandated benefit amount requirement isn't going to receive the same amount. If the employer doesn't decide that we will continue our plan for everyone and we will throw on top of that plan the additional amounts we have to pay from jurisdiction to jurisdiction. I mean, whatever they're paying into the plan, they're paying into the plan. Well, let us say, Your Honor, let us say that you had an employer who was going to provide a benefit plan at a certain cost for employees, and it was costing out the analysis, much like you would do if you were negotiating a labor contract. And it came up with an amount that it would devote to benefits around the country for its employees. Well, if each, if different jurisdictions have different amounts, they're going to require minimum amounts paid for people just in that jurisdiction, the employer is no longer going to be able to effectively use the amount that it's costed out for employees. So, for example, we introduced below a declaration from an employer that showed what its health plan was. And it was a Kaiser health plan, and the Kaiser health plan provided full coverage to employees who were eligible for the plan. And was that a national plan? That was a plan that covered, it wasn't national, but it covered people inside and outside the city and county of San Francisco. So the same people covered by the same plan for the same employer, but some of them worked in, say, Marin County and some of them worked in San Francisco County. That was a very good plan. It was a Kaiser plan. It provided full benefits. But the total amount for those benefits each month is less than the minimum expenditure requirement that the ordinance requires. The employer would actually have to top off the amount that it pays, even though it was already providing full benefits to employees. In other words. And therefore? And therefore, if an employer was unable to view its health costs nationwide or from jurisdiction to jurisdiction and level them out and achieve or perhaps competitively place insurance at a lower cost, because you have a larger population to sell them to, it's now going to have to, if it wants to meet a certain benefit amount or benefit cost at the end of the year, it's going to need to reduce benefits or costs in some areas, simply to make up the shortfall that that plan is going to be taking in San Francisco. Yeah, I'm not sure that's right. And even if that is right, I think Travelers gives you the answer. That is to say, the court in Travelers very clearly said that indirect economic effects that may in fact result in higher or lower payments in ERISA plans, that doesn't mean it's preempted. But Traveler only applies in cases where the State is operating in an area of traditional State regulation. And this is not? This is not the type of law that was at issue in Travelers or in the Travelers Treaty. I understand that. But is this not an area of traditional State regulation? The court gives you, of course, almost every ERISA case the court decides, it gives you that initial boilerplate of this is an area of traditional local or State regulation. This seems to me that this falls within that area. Although, of course, the actual regulation at issue is sort of requiring that the Blue Cross Blue Shield people paid less. There's a different regulation. I understand that. But this area of regulation falls right into the same area. Well, I believe the distinction would be that Travelers, Dillingham, De Bruno, looked at laws the type of which employers had had at the time that ERISA was in place. So, for example, they had had apprenticeship programs, had had prevailing wage rates, had had regulation of hospitals, and basic taxation laws, because De Bruno was a tax case, essentially. These are fundamental powers that the States had been exercising in broad-brush form for many years before ERISA was enacted. This type of providing health benefits is not the type of law that States have done. But I don't think the court meant it that narrowly. When it talks about traditional areas of regulation, another way of talking about it is traditional police powers. Traditional police powers include regulations for health, education, welfare, and so on. I mean, this is health. There it is. It's part of the police powers. Well, the question then would be, Your Honor, though, whether, I mean, the Supreme Court has said that Congress obviously intended to preempt quite a good number of areas of traditional, of areas that States had traditionally operated in. And if it were true that, say, health and welfare regulation were regulatable in all ways by the States at all times, it would essentially eliminate the distinction between those powers. No, I'm not saying that. And, of course, the court didn't say that either. The issue is whether or not this is an area in which we, the court presumes, and therefore we presume, of no intent to preempt. The district judge appears to have relied pretty heavily on travelers in one place, at least, in his opinion. And he says any State law that mandates employee benefits or their administration is preempted. Now, where does he get that out of travelers? Travelers held, in the fight between Blue Cross and travelers, it wasn't preempted. Well, because that would be the limiting aspect to the traveler's decision, Your Honor. Travelers recognized that there are certain areas that Congress didn't intend to be preempted at the time that it passed ERISA, or at least that it may not have expressly known that they weren't going to be preempted, but there were the types of laws that were in place and they hadn't taken any steps not to preempt them. Travelers created, as a limit to the types of State regulation that would be allowed, laws that might operate within traditional areas of State regulation, but also have an effect on ERISA plans. And that would be where that language comes from. Simply because a law falls within an area of traditional State regulation doesn't mean that it is completely exempt from ERISA preemption. If it also has another effect on plans or otherwise regulates plans, it could be preempted even though it falls within State regulation. So, for example, in greater Washington, if you were doing insurance, that could be covered as well. All right. I believe that Warm Springs, the case discussing stays and the use of expedited briefing, would support stay more rigorously in this case, or would support not issuing a stay in this case and issuing an expedited briefing schedule. In Warm Springs Dam, which was in Sonoma County, it was an Army Corps of Engineers project where the Army Corps of Engineers was looking to lease out land for a development project. They were at the stage in the project where the Corps of Engineers was going to begin considering work on the dam, but had not yet actually taken any action to build roads in to do the dam or to lease out the property or to take any of these specific steps other than begin to prepare more economic analyses and start to put out the bidding process. The Court determined that where there wasn't going to be a demonstrable injury to people that hadn't been supported by a significant amount of evidence that would show harm during the stay period, or that wouldn't show time during the period that was requested during the stay, that it would be more appropriate to impose an expedited briefing schedule rather than stay the decision of the district court below. And I think that would be more appropriate in this case. Thank you, counsel. Thank you. We could do both, couldn't we? We could stay the decision below and also order an expedited briefing schedule and an expedited appeal. Your Honor, that's my whole point about the status quo issue and the reason I wanted to address it from the beginning here. I didn't want to hear that we were saying that the court's power was limited to exercise its equitable power, but it should consider that that exercise of power is not within the traditional limits of the use of preliminary equitable relief. It should require some very specific evidence. And this case has declarations that have been submitted that are heartwarming in some ways and heart-rendering in others. And I understand that. The Association understands that. I know that you understand it. And it doesn't make them evidence. If the court's considering exceeding the traditional limits on the granting of preliminary relief, I would ask that it consider the strength of the evidence that had been submitted to it when deciding what it's going to do. Thank you very much, counsel. Thank you, Your Honor. Thank you. We'll give you four minutes because I took half a minute of your time. Thank you, Your Honor. I'll just tick off a couple of very brief points on the merits before going back to the hardships. On travelers, I would just like to quote another part of travelers from page 662. In sum, cost uniformity was almost certainly not an object of preemption. And we think that decisively answers the argument made by G.G. Ray. What was that? That was the travelers case, and it was page 514 U.S. 662. Cost uniformity was almost certainly not an object of ERISA preemption. And the point is that plan uniformity is the object of ERISA preemption. And, of course, San Francisco has a carefully designed program that ensures that if employers wish, they need not interfere with plan uniformity. On the traditional police power, just an example from San Francisco. The city recently enacted a red light camera program. There's a camera actually on the corner of 7th and Mission. As well I know, to my expense. And that obviously is a new technology and a new way of enforcing traffic safety, but that doesn't make it any less an exercise of the city's traditional police power. On the issue of calculating health. If health is a traditional matter and, therefore, can be regulated by the state or the city, without regard to ERISA or without regard to what other plans there is, what's left of ERISA that isn't preempted? There are a number of things that the city cannot do because of ERISA. The city cannot force employers to provide particular benefits to employees. The city cannot force, for example, the Hawaii. Even though health is a traditional police power. Yes. The fact that health is a traditional police power doesn't make it off limits with respect to preemption. It just creates a presumption against preemption, and only if the intent of Congress is abundant. So what you're saying is that with respect to ERISA generally, there's a presumption against preemption. If the state or the city is taking any action. With respect to health care, absolutely. If the state or the city were to try to force an employer to adopt a particular type of plan or offer a particular type of benefit. There's always a presumption, then, if the city or state is allegedly violating ERISA with respect to health care plans, as opposed to pensions, I guess. I believe that's right. Presumption against ERISA preemption. There may be an example of the city acting in the area of health care that wouldn't fall within its traditional police power, and perhaps the presumption wouldn't apply, but I can't think of an example. No, I can't think of any either. But as you say, it's just a presumption. It's clear that some health regulations or health and welfare regulations are preemptive. Absolutely. For example, we could not, and that's why we drafted the ordinance the way we did. We could not force employers to purchase health insurance from Kaiser for their employees. That would be forcing them to. That would overcome the presumption. Absolutely. Absolutely. So whenever the case, whenever it's a health plan, as opposed to a pension plan or a vacation plan, there's a presumption against preemption. I'm not willing to say that in every instance there's a presumption against preemption. I can't think of an example. No, I wouldn't think you could. Brief point about Egelhoff, which was mentioned by Mr. Rybicki. Egelhoff was preempted because it forced ERISA plans to change the beneficiary under the plan, so it acted specifically on ERISA plans. And then lastly, on the merits, unless, of course, you have further questions on the merits, this notion of having to calculate your health care expenditures in order to determine whether you've complied with the ordinance, that issue was discussed at length by Judge White, but the issue has been decided by the WSB case. The WSB case already makes clear that calculating the amount the employer expends through an ERISA plan to determine compliance with a State law does not render that law preempted. On the hardships, I just want to respond to the point made by Mr. Rybicki about the three-month delay and that nothing's going to happen, employees won't receive the benefits. I think he thoroughly explored that. Very good. Then my only final point would be a procedural one, which is obviously today we've delved deeply into the merits, the opening briefs delved deeply into the merits, and regardless of whether, obviously we continue to urge the court to grant the stay, but regardless of whether the court grants the stay or not, it's in the interest of both sides to expedite this appeal. So we would propose a couple of things. We are perfectly willing to, if the court were willing, to convert our brief that we've already filed into our opening brief in order to expedite the process, and thereby allowing GGRA to file an opposition in the city and the interveners to file a reply. And we would also be perfectly willing to consider, we've been here for, I believe, over an hour now, and we've talked extensively about the merits, we would be perfectly willing to submit the case after those briefs are filed, given the argument that we've already had.  Do you have any comment on either of those suggestions? Pardon me? We prefer a regular briefing schedule. If the city and interveners would like to convert their briefing to an opening brief, then that makes a lot of sense. But we'd obviously like an opportunity to have a regular amount of time to file our opposition brief, and then we'd like the opportunity to argue the merits. How is it expedited if everybody uses his regular time? Oh, I'm sorry, Your Honor, what I meant was we'd like to have a regular opportunity to respond, a regular opportunity for any amicus participation, and then a regular opportunity to argue. Apart from that, what we've eliminated from the process is the opening brief. So in other words, you wouldn't mind sticking them with what they wrote as their opening brief, and then you get what you would ordinarily get. Okay, I get it. I'm not going to get any better coming from them later. Thank you, Counsel. All right, the case is here. It will be submitted. Thank you all very much. The Court will stand in recess for the day.
judges: Goodwin, Reinhardt, Fletcher